Shannon **ROBERTS, aka Shannon Kimball, on behalf of herself and others similarly situated, Plaintiff,**

v.

**WESTERN AIRLINES et al., Defendants.**

**No. C–71–1194–CBR.**

United States District Court, N. D. California.

Oct. 12, 1976.

Barbara Ashley Phillips, Carter, Cook, Phillips & Voltz, San Francisco, Cal., for plaintiff.

Edwin L. Currey, Jr., Gilmore F. Diekmann, Jr., Bronson, Bronson & McKinnon, San Francisco, Cal., for defendant Western Airlines.

John Paul Jennings, John Francis Henning, Jr., Jennings, Gartland & Tilly, San Francisco, Cal., for defendants B.R.A.C. and B.R.A.C. # 3001.

## AMENDED MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

This is an action charging sex discrimination in the employment practices of Western Airlines, Inc. ("Western"), the Brotherhood of Railway and Airline Clerks ("B.R.A.C."), and the Brotherhood of Railway and Airline Clerks, Local # 3001 ("B.R.A.C. # 3001"). Plaintiff Shannon Roberts, suing on behalf of herself and others similarly situated, seeks relief against Western under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Supp. II, 1972), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Plaintiffs seek relief against B.R.A.C. and B.R.A.C. # 3001 under Title VII.[1] Jurisdiction is alleged to exist under 28 U.S.C. § 1337 and 42 U.S.C. § 2000e–5(f) (Supp. II, 1972).

Plaintiff Shannon Roberts filed a charge with the Equal Employment Opportunity Commission ("EEOC") on March 2, 1970, alleging that Western had discriminated against her because of her sex. The EEOC notified Roberts of her right to sue on May 21, 1971, and plaintiff filed this suit against

---

1. Plaintiffs have dropped their claim that B.R. A.C. and B.R.A.C. # 3001 violated the duty of fair representation required of unions by the Railway Labor Act, 45 U.S.C. §§ 151 et seq.

Western on June 18, 1971. Roberts's EEOC charge against B.R.A.C. # 3001 was filed on June 17, 1971, and her right-to-sue notice was issued on September 30, 1971. Roberts amended her complaint against Western on October 26, 1971, at which time she joined B.R.A.C. and B.R.A.C. # 3001 as co-defendants.

## I. CLASS ACTION

On May 31, 1974, the Court held that plaintiffs could tentatively maintain this suit as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class was defined as "all women who were employed on or after December 1, 1969 by defendant Western Airlines as senior or regular Customer Service Representatives in Passenger Service who were members of B.R.A.C. subject to that certain agreement between Western Airlines and B.R.A.C. effective October 1, 1969." For purposes of this decision, the Court will establish an "equal employment opportunities" subclass consisting of all female Customer Service Representatives employed by Western during the period December 2, 1969 through August 17, 1970, in California, Nevada, Oregon, or Utah who were members of B.R.A.C. subject to that certain agreement between Western and B.R.A.C. effective October 1, 1969.

■ Plaintiffs also seek to recover damages from Western for violation of the Equal Pay Act, 29 U.S.C. § 206(d), which forbids employers paying unequal wages for equal work because of an employee's sex. Plaintiffs may not bring such a suit as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. 29 U.S.C. § 216(b) provides that an action against any employer for violation of § 206 may be maintained by an employee on behalf of himself and other employees similarly situated, but that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Rule 23(c)(3), on the other hand, provides that all members of a class to be determined by the court are bound by a decision in a Rule 23(b)(2) class action, even if they are not notified of the suit. Since a class action may be maintained for a violation of 29 U.S.C. § 206 only if all the members have "opted in," and since a Rule 23 class action does not give plaintiffs that option, an Equal Pay Act suit may not be maintained as a class action under Rule 23. *LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 288 (5 Cir. 1975); *Sims v. Parke Davis & Co.,* 334 F.Supp. 774, 780–781 (E.D.Mich.), *aff'd* 453 F.2d 1259 (6 Cir. 1971), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972).

■ Plaintiffs have requested that Western employees be allowed to opt into this suit under § 216(b) after the case is decided on the merits. While § 216(b) does not specify when an employee must become a party,[2] individuals should not be allowed to do so after judgment has been entered. Such a practice would allow employees to be bound when a judgment is advantageous and to be free when it is unfavorable. One of the primary purposes of the 1966 amendments to the Federal Rules of Civil Procedure was to eliminate this type of "one way intervention" in spurious class actions under the then-existing Rule 23,[3] and this Court will not encourage similar conduct under the Fair Labor Standards Act. Accordingly, the class action asserted against Western for violation of 29 U.S.C. § 206(d) will be dismissed.

## II. PERIOD OF RECOVERY

■ In 1972, Congress amended § 706 of the Civil Rights Act of 1964 to provide for a two-year limitation on the period for which

---

**2.** Section 216(b) does provide that an employee may not become a party after the Secretary of Labor has filed a complaint under 29 U.S.C. § 217 seeking a restraint "of any further delay in the payment of unpaid minimum [or overtime] wages."

**3.** *See* Advisory Committee Note to Fed.R.Civ.P. 23, 39 F.R.D. 98, 106 (1966); 7A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1789, at 175 (1972).

back pay may be awarded under Title VII.[4] Prior to that time, Title VII did not specify the period for which back pay could be awarded.[5] Because of the potentially disastrous economic impact on employers, federal courts were loath to hold defendants liable for back pay accrued during the entire period since the effective date of the 1964 Civil Rights Act (July 2, 1965). Instead, courts characterized back pay under Title VII as a federal right for which Congress did not prescribe a "statute of limitations," and applied the state statute of limitations that would have been appropriate had the suit been brought in state court. *E. g., United States v. Georgia Power Company*, 474 F.2d 906, 922–924 (5 Cir. 1973). *See Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

The 1972 amendment, however, makes reliance upon state statutes of limitations unnecessary. In *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 522 (6 Cir. 1976), the Sixth Circuit rejected the defendant's contention that a Title VII claim for back wages should be governed by the Tennessee statute of limitations:

> "Title VII establishes its own statute of limitations, and state law is irrelevant in determining whether a private individual has lost his right of action under Title VII through the passage of time. * * *
>
> " * * * Under the 1972 amendments, which apply to the case at bar, '[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.' 42 U.S.C. § 2000e–5(g). Thus state law does not apply to determine the timeliness of the action or to limit the relief available to Draper."

*Accord, Stroud v. Delta Airlines, Inc.*, 392 F.Supp. 1184, 1190 n. 3 (N.D.Ga.1975). As the Supreme Court stated in *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946):

> "If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter. The Congressional statute of limitation is definitive."[6]

---

4. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4(a), 86 Stat. 103, *amending* 42 U.S.C. § 2000e–5(a)–(g) (codified at 42 U.S.C. § 2000e–5(g) (Supp. II, 1972) ("1972 amendment").

5. Courts often refer to this period as the applicable "statute of limitations." It should be noted, however, that this period deals solely with the time for which damages may be recovered, and not the time within which a claim must be filed or else be barred. When this suit was filed, Title VII provided that in a state which had no appropriate employment commission, a plaintiff must file an EEOC charge within 90 days of the alleged act of discrimination and must file a court action within 30 days of receiving a right-to-sue notice. 42 U.S.C. § 2000e–5(d) and (e) (1970). *See Piva v. Xerox Corporation*, 376 F.Supp. 242, 244–245 (N.D. Cal.1974); *Jackson v. Cutter Laboratories*, 338 F.Supp. 882, 885 (E.D.Tenn.1970) (only jurisdictional time requirement in Title VII is that plaintiff must file suit within time limits specified in 42 U.S.C. § 2000e–5).

6. Several courts have concluded that Congress did not intend the 1972 amendment to create a federal period of recovery for back pay awards; instead, Congress merely meant to establish a maximum limit in the event that an applicable state statute allowed a longer period of recovery. *Equal Employment Op. Com'n v. Griffin Wheel Co.*, 511 F.2d 456, 458–459 (5 Cir. 1975); *E.E.O.C. v. National Cash Register Company*, 405 F.Supp. 562, 573–574 (N.D.Ga.1975) *Equal Employment Op. Com'n v. Union Oil Co. of Cal.*, 369 F.Supp. 579, 588 (N.D.Ala.1974) (*dictum*). These opinions cite no legislative history to support their conclusion.

It is highly unlikely that Congress consciously would choose to make the scope of a federal right vary with the state in which the plaintiff happens to bring his or her action. Moreover, even a cursory examination of the amendment's legislative history shows that Congress *did* intend to create a two-year federal period of recovery to govern the award of back pay under Title VII.

When the House Committee on Education and Labor first reported out the bill which was to become the Equal Employment Opportunity Act of 1972 (H.R. 1746), the bill did not provide for a limitation on the amount of pay to be awarded under Title VII. The Minority Report condemned certain "critical omissions" in H.R. 1746, the first of which was that the bill did not contain a statute of limitations on the recovery of back pay:

> "Civil suits in most jurisdiction [*sic*] are subject to statutes of limitations ranging usually between two or three years. Under existing law, recovery of backpay in such pattern or

Because plaintiffs filed this action prior to 1972, the two-year federal period will govern only if it is to be applied retroactively. The Court of Appeals for the Fifth Circuit has held that suits in which judgments were entered before the effective date of the 1972 amendment (March 24, 1972) should be governed by the applicable state statute of limitations.[7] Courts in at least two cases where judgment was entered after March 24, 1972, have also held that the federal period does not apply because the action was filed before the effective date of the 1972 amendment.[8] None of these decisions has given any rationale for refusing to apply the federal period of recovery in cases decided after March 24, 1972. In fact, they have not even considered the question.

It is well settled that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory di-

rection or legislative history to the contrary." *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (retroactive application of 20 U.S.C. § 1617 (Supp. II, 1972) which provides for attorneys' fees in school desegregation cases). The Court will apply the two-year period of recovery to this case, which was pending in court in March 1972, because doing so will not result in injustice to the parties and is consistent with the purpose of the 1972 amendment.

Most of the litigation surrounding the retroactivity of the 1972 amendment has concerned § 11, which makes Title VII applicable to employment discrimination by the federal government. While the Court of Appeals for the Sixth Circuit has held that § 11 is not to be applied retroactively, every other circuit court considering the question has held that the section should be so applied and the Supreme Court has now vacated the Sixth Court decision.[9] Each

practice suits can extend back to 1965, the effective date of enactment of the Civil Rights Act of 1964. Thus potential respondents whether they be employers, labor organizations or employment agencies may be subject to enormous monetary penalties in the absence of a definite limitation. To avoid the litigation of stale charges and to preclude respondents from being subject to indefinite liabilities, it is clear that a precise statute of limitations is needed." H.Rep.No.92–238, 92d Cong., 1st Sess. 66 (1971), U.S.Code Cong. & Admin.News 1972, pp. 2137, 2175. The day before the House debated H.R. 1746, one of the bill's sponsors, Representative Dent, proposed three "compromise amendments" in response to the minority's criticisms: "My first amendment would impose a 2-year 'statute of limitations' on the awarding of backpay and reinstatement under title VII." 117 Cong.Rec. 31784 (1971). The next day in debate, Representative Erlenborn expressed his support of a two-year limitation: "It is only fair to say that liability should not go back ad infinitum but that there should be some reasonable statute of limitations." 117 Cong.Rec. 31981 (1971). The legislative history not only shows that Congress intended to establish a federal period of recovery but, it also indicates that the Congressmen thought that the alternative to a federal period of recovery was back pay liability extending from the effective date of the 1964 Civil Rights Act. *See* H.Rep.No.92–238, *supra*, at 66; 117 Cong.Rec. 31981 (1971).

7. *Franks v. Bowman Transportation Company*, 495 F.2d 398, 405, 419 (5 Cir.), *cert. denied*, 419

U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211, 216, 258 (5 Cir. 1974); *United States v. Georgia Power Company, supra*, 474 F.2d 922–924. Neither the *Franks* nor the *Georgia Power* opinion is entirely clear as to the exact date of the district court decision.

8. *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rub. Pl.*, 491 F.2d 1364, 1369–1370, 1378 (5 Cir. 1974); *Payne v. Weirton Steel Company*, 397 F.Supp. 192, 194 (N.D.W.Va. 1975). *See Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 522 (6 Cir. 1976); *Stroud v. Delta Airlines, Inc.*, 392 F.Supp. 1184, 1190 n. 3 (N.D.Ga.1975) (state statutes govern in suits *filed* before March 24, 1972) (*dictum*); *Puntolillo v. New Hampshire Racing Commission*, 390 F.Supp. 231, 235 (D.N.H.1975) (plaintiff must show that he instituted administrative relief prior to March 24, 1972, before 1972 amendment applies retroactively to discrimination by a state).

9. *Compare Place v. Weinberger*, 497 F.2d 412, 413–415 (6 Cir. 1974), *vacated and remanded*, 426 U.S. 932, 96 S.Ct. 2643, 49 L.Ed.2d 383 (1976) (not retroactive), *with Adams v. Brinegar*, 521 F.2d 129, 131–134 (7 Cir. 1975); *Sperling v. United States*, 515 F.2d 465, 473–474 (3 Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976); *Brown v. General Services Administration*, 507 F.2d 1300, 1304–1306 (2 Cir. 1974), *aff'd on other grounds*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976);

circuit court has emphasized that no injustice will result from retroactive application because "the government has no vested right to discriminate against its employees on the basis of race." *Koger v. Ball*, 497 F.2d 702, 706 (4 Cir. 1974).[10]

In *Davis v. Valley Distributing Company*, 522 F.2d 827 (9 Cir. 1975), the Court of Appeals for this circuit accorded retroactivity to the same section of the 1972 amendment involved in this case. In *Davis* an employee had filed his claim with the EEOC on March 14, 1972, 135 days after the alleged act of discrimination. At the time Davis filed his charge, Title VII required such complaints to be filed within 90 days. The court held that Davis's claim was within the 180 days allowed by the 1972 amendment, and that the new time limit should apply to acts of discrimination which occurred within 180 days before the effective date of the amendment. In so holding, the court noted that no injustice would result because there is no "vested right or property interest in immunity from liability for discriminatory acts" and because "there has been no suggestion in this case that the limitations provision tended to induce reliance of a kind that would make its retroactive extension [oppressive] * * *." 522 F.2d at 830 n.7.

Defendants in this case have no vested interest in forcing the victims of their discriminatory acts to go uncompensated. The two-year period for recovery of back pay, like the filing requirements in *Davis*, "do[es] no more than prevent [the] EEOC and the courts from dealing with stale

claims." 522 F.2d at 830 n.7. There is also no evidence whatsoever that the defendants acted in reliance on the applicability of some shorter period of recovery.

While § 14 of the 1972 amendment makes it clear that Congress intended that the amendments to § 706 would apply to cases pending before the EEOC on March 24, 1972,[11] the section does not state whether the changes will also apply to Title VII cases pending in federal court on that date. In the absence of the statute or the legislative history showing that Congress intended otherwise, this Court will apply the period of recovery which is in effect at the date of this decision. *See Bradley v. Richmond School Board, supra*, 416 U.S. at 711, 715, 94 S.Ct. 2006.

The basic purpose of the 1972 amendments to § 706 was to give the EEOC additional powers—such as the ability to issue cease and desist orders—that would better enable the Commission to enforce compliance with its decisions. H.Rep.No. 92–238, 92d Cong., 1st Sess. 1 (1971); *Sperling v. United States*, 515 F.2d 465, 469–473 (3 Cir. 1975), *cert. denied*, 426 U.S. 919 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). Senator Javits introduced what was to become § 14 at the request of the Justice Department. 118 Cong.Rec. 4816 (1972). The sole purpose of the amendment was to allow the EEOC to use the newly created enforcement powers in dealing with its huge backlog of cases:

"We see no reason why the many thousands of persons who have filed charges which are still being processed and who

*Womack v. Lynn*, 164 U.S.App.D.C. 198, 504 F.2d 267, 269–270 (1974); *Koger v. Ball*, 497 F.2d 702, 704–709 (4 Cir. 1974) (retroactive).

The question now appears to be settled. The Solicitor General has stated that the United States will no longer contest its liability for employment discrimination in cases administratively pending on the effective date of the 1972 amendment. United States Solicitor General's Memorandum in Response to a Petition for Rehearing in *Place v. Weinberger, supra*, 3 CCH Emply.Prac.Dec. ¶ 5329 (1975). *See Place v. Weinberger, supra*, 426 U.S. 932, 96 S.Ct. 2643, 49 L.Ed.2d 383.

10. See cases collected in note 9 *supra*. Even the one court which held the 1972 amendment not to be retroactive did so on the ground that waivers of sovereign immunity should be strictly construed, and not on the ground that doing so would result in any injustice to the defendant. *Place v. Weinberger, supra*, 497 F.2d at 414.

11. Section 14 provides:
"The amendments made by this Act to section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the [Equal Employment Opportunity] Commission on the date of enactment of this Act and all charges filed thereafter."

have waited as long as 18 months to two years for resolution of them should not have the benefit of the new enforcement authority." Justice Department letter to Senator Scott, quoted in *Equal Emp. Op. Com'n v. Christiansburg Garment Co., Inc.*, 376 F.Supp. 1067, 1074 (W.D.Va. 1974).

Section 14 allowed the EEOC to make maximum use of its new powers and still not be inundated by past complainants who wish to reopen every closed case and to take advantage of the new law. Consistent with this purpose, most of the courts which have refused to apply the 1972 amendment retroactively because a claim was not pending before an administrative agency on March 24, 1972, have done so only where the plaintiff was trying to reopen a previously closed case.

In *Equal Emp. Op. Com'n v. Christiansburg Garment Co., Inc. supra*, 376 F.Supp. at 1074, the court refused to allow the EEOC to sue an employer in January, 1974, in a case where the Commission had given the complainant a "right to sue" notice in 1970, and she had never filed suit. 376 F.Supp. at 1068–1069 & n.2. The court emphasized that any other conclusion would mean

> "that any charge filed after July 2, 1965, the effective date of the original Act, which was not dismissed by the EEOC after an investigation or resolved by conciliation can now be said to be pending under § 14 of the 1972 amendments and thus resurrected for suit by the EEOC." 376 F.Supp. at 1073.

In *Thompson v. Link*, 386 F.Supp. 897, 898–900 (E.D.Mo.1974), the court refused to allow a suit under § 717 by a man who had allegedly suffered discrimination in May, 1971, but had not filed an administrative charge until November, 1973. The court noted that "the whole tenor" of the Civil Rights Act is to encourage the prompt filing of charges and emphasized that § 717

"should not be extended to include claims that arose out of pre-act discrimination, but were not brought before an administrative body until some time after the new section went into effect. * * * [To do so] would create an incongruous result in that persons who promptly processed their claims administratively and had them concluded before the new law went into effect, would be barred from bringing suit while one who waited two and one-half years to file his administrative charges may now litigate his pre-act discrimination charge." 386 F.Supp. at 899.

Other cases denying retroactive effect to the 1972 amendment have concerned facts similar to those in *Christiansburg* and *Thompson*: *Clark v. Goode*, 499 F.2d 130, 130–133 (4 Cir. 1974) (final administrative action in January, 1971, suit not filed until February, 1973); *Petterway v. Veterans Admin. Hosp., Houston, Tex.*, 495 F.2d 1223, 1224 (5 Cir. 1974) (final administrative action in September, 1971, suit not filed until July, 1972).

This case is very different from those in which courts have refused to accord the 1972 amendment retroactive effect. Plaintiffs diligently pursued their administrative remedies and promptly sought judicial relief after final administrative action. No legitimate purpose could be served by refusing to apply the provisions of the 1972 amendment to Title VII cases that were properly pending in federal court on March 24, 1972. Indeed, the Court of Appeals for the District of Columbia, per Wright, J., has held that suits pending in federal court on the effective date of the 1972 amendment are subject to its provisions. *Womack v. Lynn, supra*, 504 F.2d at 269 & n. 6.[12]

The Court is also influenced by the recent Ninth Circuit decision in *Davis v. Valley Distributing Company, supra*, 522 F.2d 827, which applied a liberal standard of retroac-

---

12. The Sixth Circuit has also refused to give a narrow construction to the meaning of "charges pending" on March 24, 1972. *Equal Employment Op. Com'n v. Kimberly-Clark*

Corp., 511 F.2d 1352, 1355 (6 Cir. 1975), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975) (will not differentiate between "charges" and "cases").

tivity to the provisions of § 706 and expressed a preference for using federal rather than state statutes of limitations in Title VII actions. As discussed *supra, Davis* concerned an employee who had filed his complaint with the EEOC 135 days after the alleged discrimination. Even though the statutory limit at the time of filing was 90 days,[13] and the EEOC could not have acted on the complaint without the 1972 amendment's extension of the time limit to 180 days, the court held that the claim could still be maintained. The court noted that "subsequent extensions of a statutory limitation period [generally] will not revive a claim previously barred" but concluded that an exception should be made for § 706 because Congress intended it "to encompass discriminatory conduct that occurred before the Act was passed." 522 F.2d at 830–831. Surely, if Congress intended the 1972 amendment to apply to claims that were barred before its enactment, Congress also intended the amendment to apply to actions that were diligently pursued and were pending in court on March 24, 1972.

Davis also failed to file his complaint with the Arizona Civil Rights Commission within the 60-day period required by state statute. The court concluded that this omission would not bar his access to a federal judicial remedy because if it did,

"the state and not the federal period of limitations would control the availability of the federal remedy. * * *

" * * * It is unlikely that Congress intended that its judgment with respect to the maximum period within which a claim of employment discrimination affecting interstate commerce might be made could be displaced by legislatures of the states." 522 F.2d at 832.

If the § 706 two-year period of recovery for back pay awards is held not to apply to this case, the Court must apply the California statute that would govern if the claims were brought in state court. *See Cope v. Anderson,* 331 U.S. 461, 463–464, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); *United States v. Georgia Power Company, supra,* 474 F.2d at 922–924. This use of a state statute of limitations to govern the availability of a federal remedy is inconsistent with the position expressed by the Ninth Circuit in *Davis.*

■ The retroactive application of the two-year limitation on the period for recovery of back pay under Title VII will not result in manifest injustice to the defendant, is consistent with congressional intent, and will avoid applying a state statute of limitations to a federal remedy. Moreover, such an application will allow the plaintiffs to recover two years of back wages rather than one.[14] This longer period of recovery

---

**13.** The 90-day limit applied to charges filed directly with the EEOC. A claimant could file a Title VII action within 210 days of the alleged act of discrimination if he or she first filed a claim with a state agency. The plaintiff in *Davis* filed his claim with the Arizona Civil Rights Commission 114 days after the alleged discrimination. This delay exceeded the 60-day limit imposed by Arizona law. 522 F.2d at 829. Even though Davis filed his federal claim within the 210-day federal limit, the court declined to decide "whether the longer federal limitations period would be available to a complainant whose state filing is untimely." 522 F.2d at 833. *See Olson v. Rembrandt Printing Co.,* 511 F.2d 1228, 1233 (8 Cir. 1974) (*en banc*) (to take advantage of 210-day limit, complainant must file state claim within 90 days); *Dubois v. Packard Bell Corporation,* 470 F.2d 973, 974 (10 Cir. 1972) (complainant must abide by state statute of limitations to take advantage of longer federal time limit).

**14.** Under California law this action would have a one-year period of recovery, as provided for in either the California Fair Employment Practices Act, California Labor Code § 1422, or California Code of Civil Procedure § 340 (liability arising from personal injury). Both of these statutes are more particular than the three-year statute of limitations for liability created by statute provided for in California Code of Civil Procedure § 338(I). Title VII parallels the California fair employment legislation in that both seek to correct employment discrimination by creating complex administrative machinery to encourage conciliation and settlement. The one-year limitation for liability based on a personal injury also appears to be applicable to Title VII suits. In *Equal Employment Op. Com'n v. Detroit Edison Co.,* 515 F.2d 301, 315 (6 Cir. 1975), the Sixth Circuit held a similar Michigan personal injury statute of limitations applicable to Title VII actions because "[t]he deprivation of civil rights is a wrong to the person."

is consistent with the recognized policy of construing Title VII liberally in favor of victims of discrimination:[15]

"The Equal Employment Opportunity Act is a remedial statute to be liberally construed in favor of victims of discrimination. *EEOC v. Wah Chang Albany Corp.*, 499 F.2d 187, 189 (9th Cir. 1974). Accordingly, 'courts confronted with procedural ambiguities in the statutory framework have, with virtual unanimity resolved them in favor of the complaining party.' *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 461 (5th Cir. 1970)." *Davis v. Valley Distributing Company, supra*, 522 F.2d at 832.

■ The filing of an EEOC charge tolls the statute of limitations in a Title VII action. *United States v. Georgia Power Co., supra*, 474 F.2d at 925; *Equal Employment Op. Com'n v. Detroit Edison Co., su-*

*pra*, 515 F.2d at 315. Therefore, the statute was tolled on March 2, 1970, with respect to Western,[16] and on June 17, 1971, with respect to B.R.A.C. and B.R.A.C. # 3001.[17]

## III. EQUAL OPPORTUNITIES

Plaintiffs assert that Western has denied women equal job opportunities, and that where Western has allowed women to perform the same work as men, it has not paid them at an equal rate.[18] Western contends that it limited women's job opportunities in only a few instances, and then solely because such restrictions were required by state protective laws. Western denies that women who did the same work as men were paid at a lower rate. Four of the fourteen states in which Western carried on its operations during times relevant to this lawsuit had laws limiting the amount of weight that female airline employees could carry in the course of their employment,[19] and five

Plaintiffs cite California Labor Code § 1426 for the proposition that there may be a distinction between the period within which a suit may be filed and the time for which back pay will be permitted. The Court disagrees. Section 1426, which allows the Commissioner to order payment of back wages, is limited by the time period provided in § 1422. Otherwise, § 1426 would permit the filing of suits based upon stale and otherwise barred claims whenever it was alleged that claims were continuing, and the last act complained of fell within the applicable statute of limitations.

15. In another recent decision, the Court of Appeals for the Ninth Circuit refused to apply the California statute of limitations to EEOC actions for the recovery of back pay. *Equal Employment Opportunity Commission v. Occidental Life Insurance Co. of California*, 535 F.2d 533 (9 Cir. 1976). While the court did not reach the question of whether the "state limitations statute would apply had an individual or a class, rather than the EEOC, been party plaintiff," at 537 n. 6, it did emphasize the remedial and public policy aspects of Title VII back pay recoveries. At 537–539.

16. Plaintiff Roberts actually filed three charges against Western with the EEOC on March 2, 1970, February 3, 1971, and March 5, 1971. Only the March 2, 1970 charge alleged discrimination on the basis of sex; the other two alleged retaliation for filing the first charge. For the purpose of tolling the statute of limitations, the first charge is the relevant one.

17. B.R.A.C. is a proper defendant in this suit even though plaintiff Roberts did not name the

international union in her EEOC charge. See Part V *infra*. B.R.A.C. is potentially liable for any back pay accruing to plaintiffs during the two years preceding June 17, 1971. The use of the EEOC filing date, rather than the date the court suit was filed, will not be unfair to B.R.A.C. because, regardless of which date is used, the international union's liability will extend beyond the date the charge first was filed with the EEOC.

Congress clearly intended the back pay period to start with the date a plaintiff filed charges with the EEOC. The House and Senate versions of the 1972 amendment differed as to the date from which liability for back pay should extend. The House bill measured the two-year period from the date a complaint was filed with the court, and the Senate version made the filing date of the EEOC charge the relevant time. The Conference Committee accepted the Senate version. S.Rep.No.92–681, 92d Cong., 2d Sess. 18–19 (1972).

18. After trial, counsel for plaintiffs sought to amend the complaint to conform to evidence adduced with respect to a claim of denial of promotion to management. After careful review of the entire record, the Court finds that there is not sufficient evidence in support of the motion and it will be denied.

19. California Labor Code §§ 1250–1252, California Industrial Welfare Commission Transportation Order 9–68; Industrial Commission of Utah, Welfare Regulations for Any Occupation, Trade, or Industry; Alaska General Safety Code, Ch. 27, § 27.02; Oregon Sanitation and

states had laws restricting the number of hours that female airline employees could work.[20] Western asserts that it complied with the laws in most of these states until August 17, 1970, when it circulated a memo to all stations advising them to cease doing so.

■ The Court is persuaded that Western relied in good faith on Utah and California laws restricting the amount of weight that female airline employees could handle. In light of the time pressures and scheduling difficulties inherent in airline work, the fact that women occasionally carried weights in excess of the requirements does not undermine Western's good faith. Even the most diligent efforts to ensure that men would always be present in areas where heavy objects must be carried could not practically avoid situations where a female employee might have to carry an excessive weight. Nor does Western's use of manual stair chairs rather than more mechanized means of helping handicapped persons into airplanes undermine its good faith. A showing of bad faith must clearly reflect an intent not to conform with the state law; Western's utilization of stair chairs at most demonstrates either an effort to economize or an insensitivity to the problems caused by the stair chairs.

Both parties agree that the station manager in Alaska disregarded the statute restricting the weight that women could lift because of the female-dominated labor market in that state. This does not cast doubt on Western's good-faith reliance in other states, however, because the job assignments were made at the local station manager level.

The application of Oregon's weight restriction law to Western's operations was never entirely clear. The law specifically applied to the airline industry, but the baggage check-in facilities in Portland are set up in such a way that an agent can slide bags off the baggage scale onto the elevator platform without having to lift them. Western did not regularly assign women to the Portland baggage check-in until sometime in 1969 when its Salem, Oregon representative determined that the Oregon law did not apply to such an operation. Plaintiffs assert that Western was not justified in restricting female job assignments in reliance on Oregon Sanitation and Physical Welfare Order No. 16, because the order did not govern the employment of female service representatives by Western. In fact, the order governed all types of employment not covered by other state standards, including that of Western's female passenger service employees.

Western also asserts its good-faith reliance on state laws as a defense to plaintiff's claims for overtime pay. Of the five states with laws limiting the hours that women could work, plaintiffs only presented evidence that Western imposed restrictions on hours in Nevada and California. Until August, 1970, Nevada Revised Statutes §§ 609.030 and 609.110 restricted women to four hours of overtime per day. The statute was never relied upon, however, because there were so few women working for Western in Reno prior to August, 1970, and overtime was offered to women only after being offered to available male agents. Until August 1970, Western observed California Labor Code §§ 1350 and 1351 and Transportation Order No. 9–68 which restricted the number of hours that female airline employees could work in California.[21]

Physical Welfare Order No. 16, Oregon Manufacturing Order No. 8.

---

**20.** California Industrial Welfare Commission Transportation Order No. 9–68, California Labor Code §§ 1350 and 1351; Arizona Revised Statutes § 23–281 (repealed in 1970); Nevada Revised Statutes §§ 609.030 and 609.110; South Dakota Code § 60–12–1; Utah Statutes § 34–22–3.

**21.** Women worked overtime in both Los Angeles and San Francisco during emergencies such as fog. Transportation Order 9–68 suspended its hours requirements during "emergencies" which it defined as "unpredictable or unavoidable occurrence[s] at unscheduled intervals requiring immediate action." Fog is not predictable or frequent enough at the Los Angeles or San Francisco stations to allow appropriate advance adjustment of the job assignment calendar.

Even though Western relied on state protective laws in good faith, the question still remains whether such reliance is a defense to a Title VII claim. The Ninth Circuit considered this issue in *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1006–1008 (9 Cir. 1972), and concluded that good faith may be a defense:

> "[I]n each case the merits of the plaintiff's claim and the public policy behind it must be balanced against the hardship on a good-faith employer." 462 F.2d at 1007.

In *Schaeffer,* the court found that the defendant no longer was acting in good faith as of January, 1969, when it had knowledge both of the EEOC's decision in favor of the plaintiff and of the decision in *Rosenfeld v. Southern Pacific Co.,* 293 F.Supp. 1219 (C.D. Cal.1968). It would be "unfair to force an innocent employee to forego his rights under law while litigation drags through the courts * * *." 462 F.2d at 1007.

A January, 1969 cut-off date on Western's good-faith reliance defense in this case would place too great a burden on Western and other employers to be aware of and act immediately upon every EEOC decision. The EEOC's official reversal in policy with respect to state protective laws on August 19, 1969, however, should have prompted Western to terminate its reliance on those laws. In light of the Supreme Court's statement that administrative interpretations by the EEOC are entitled to great deference, *Griggs v. Duke Power Co.,* 401 U.S. 424, 443–444, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this August change in policy in conjunction with the district court decision in *Rosenfeld* constitutes sufficient warning to employers. *See also Williams v. General Foods Electric Corp.,* 492 F.2d 399, 408 (7 Cir. 1974); *Kober v. Westinghouse Electric Corp.,* 480 F.2d 240, 248–249 (3 Cir. 1973). Allowing ten days for Western to learn of the EEOC change in position and to end its compliance with the state laws, the appropriate cut-off date for Western's good-faith reliance is August 29, 1969.

The August 29, 1969 cut-off date for Western's defense of good-faith reliance on state protective laws is almost exactly one year before Western discontinued its compliance with those laws on August 17, 1970. Western is liable to plaintiffs to the extent that its compliance with the laws during that year restricted female job assignments or limited female overtime hours. Beyond that, however, plaintiffs have failed to carry their burden of persuasion. Plaintiffs have failed to establish that Western denied its female agents equal employment opportunities in the states with no protective laws, the states with protective laws which were disregarded, and all states after August 17, 1970.

█ Western required women at several stations to take various tests of their ability to perform the job for which they bid, such as carrying stair chairs and opening and closing airplane doors. While plaintiffs claim that only women were tested, none of the evidence cited by plaintiffs justifies this assertion and at least three witnesses testified that both sexes were tested. The evidence does not show that Western gave weight lifting or door opening and closing tests to females at any station because of their sex. The criteria could equally have been weight and height, or an estimation of strength, all of which are directly related to a person's ability to open and close airplane doors. The fact that at least some men were tested indicates that sex was not the determinative factor for administering the tests.

While women may have been discouraged from bidding on jobs in a few instances, the evidence indicates that these occurrences were the result of the actions of a small number of Western employees rather than a general policy of keeping women in low-pay, low-seniority positions. In fact, there is a more plausible and obvious explanation for every instance of apparent injustice pointed out by plaintiffs than the theory that Western was carrying out a policy of sex discrimination.

Similarly, plaintiffs' statistics are not persuasive. Although plaintiffs document the fact that women were promoted in far fewer numbers than men, it is impossible to compare the percentage of female bids granted with the percentage of male bids granted, because plaintiffs have not presented the numbers of men and women bidding for these positions. Nor do plaintiffs answer Western's contention that women restricted their bids to the more desirable shifts much more frequently than men did. Without this additional information, the fact that fewer women than men were promoted is meaningless. While plaintiffs also present statistics showing that a much larger percentage of men are senior agents than women with the same seniority date, Western's statistics show that male senior agents have an average of about 4½ more years of service than female agents. The Court is also wary of plaintiffs' statistics compiled from January, February, March and July, 1969, because plaintiffs fail to explain their reasons for singling out those particular months.

Finally, the Court has been unable to find evidence of a single instance where a female bid for senior agent was denied in favor of a less senior male agent where no extenuating circumstances were present. In each of the few instances where a more senior woman was denied a bid, there was a clear justification such as the woman's having a medical disability or having failed the senior agent exam. Thus, other than the job restrictions caused by Western's reliance on state protective laws from August 19, 1969, to August 17, 1970, plaintiffs have failed to carry their burden of persuasion in demonstrating that defendants denied them equal employment opportunities.

22. See Part I, supra, at 419.

23. Corning Glass Works involved a claim for equal pay brought under the Equal Pay Act. Because the provisions of the Civil Rights Act regarding discrimination based on sex "are in pari materia with the Equal Pay Act," Shultz v. Wheaton Glass Co., 421 F.2d 259, 266 (3 Cir. 1970), the elements of a denial of equal pay are

## IV. EQUAL PAY

Plaintiffs also seek relief under both the Equal Pay Act of 1963 (29 U.S.C. § 206(d)) and Title VII. Because the plaintiff class recognized in this action is not a class within the meaning of § 216(b) of the Fair Labor Standards Act of 1938,[22] the Court will dismiss the claim under that Act. Plaintiffs' suit for equal pay under Title VII remains. In order to demonstrate a denial of equal pay under Title VII, plaintiffs must show that (1) the work of the employees of one sex required the exercise of substantially equal skill, effort, and responsibility and was performed under similar working conditions as that of employees of the opposite sex, and (2) the pay to men and women was unequal. Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).[23]

The 1966 Collective Bargaining Agreement ("1966 Agreement") between B.R.A.C. and Western placed station agents on a higher pay scale than transportation agents. That contract also provided that "those Transportation Agents assigned regularly to perform Station Agent duties for four (4) hours or more per day will be paid Station Agent rates of pay but will remain in the Transportation Agent classification." The contract further stated that "[t]he pay of women employees for the same class of work, shall be the same as that of men." On October 1, 1969, the new Collective Bargaining Agreement ("1969 Agreement") merged the positions of transportation agent and station agent into the single position of customer service representative. All customer service representatives received the same rate of pay.

Any denial of equal pay under the 1966 Agreement ceased on October 1, 1969, when the new Collective Bargaining Agreement went into effect.[24] Plaintiff Roberts

the same under both Title VII and the Equal Pay Act. Ammons v. Zia Company, 448 F.2d 117, 119, 120 (10 Cir. 1971).

24. Plaintiffs also allege denials of equal pay by Western after October 1, 1969. After a full trial on the merits, the Court finds these allegations to be unsubstantiated.

did not, however, file her first EEOC charge until March 2, 1970. In 1970, Title VII plaintiffs were required to file charges "within ninety days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(d) (1970).[25] The time in which to file charges concerning alleged discrimination under the 1966 Agreement expired on December 31, 1970. Failure to satisfy this statutory filing requirement deprives the Court of jurisdiction. *Collins v. United Air Lines, Inc.,* 514 F.2d 594 (9 Cir. 1975); *Griffin v. Pacific Maritime Association,* 478 F.2d 1118, 1120 (9 Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973).

▮ Plaintiffs argue that the charge was timely filed because the equal pay claim is "only part and parcel of Western's continuing pattern of employment discrimination against women." Memorandum re Timeliness of Plaintiffs' EEOC Charge at 3 (filed August 20, 1976). The Court agrees that a suit is not barred by the statute of limitations if the single act complained of is part of an ongoing violation of Title VII. *Rich v. Martin Marietta Corporation,* 522 F.2d 333, 348 (10 Cir. 1975); *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App. D.C. 69, 478 F.2d 979, 985–990 (1973); *Cox v. United States Gypsum,* 409 F.2d 289, 290–291 (7 Cir. 1969). The Court, however, does not agree that the instant case involves such an ongoing violation. Plaintiffs simply did not prove their allegations that Western engaged in pervasive and continuing discrimination in its employment practices. After a full trial on the merits, the Court has found reliance on state protective laws to be Western's only discriminatory practice after October 1, 1969—and that practice ceased on August 17, 1970. Since there was neither a continuing equal pay violation nor a pervasive pattern of discrim-

ination, the Court will dismiss plaintiffs' charge concerning the 1966 Agreement for lack of jurisdiction.

## V. LIABILITY OF B.R.A.C. AND B.R. A.C. # 3001

Defendants B.R.A.C. and B.R.A.C. # 3001 contend that, as a result of plaintiff Roberts's failure to charge the International in the EEOC proceedings prior to this action, the Court lacks jurisdiction over B.R.A.C. International. Section 2000e–5(e) provides that if subsequent to the filing of a charge of discrimination, the EEOC is unable to achieve compliance with the Act, "a civil action may * * * be brought against the respondent in the charge." Courts have generally interpreted this provision to mean that a charge must be filed against a party with the EEOC before a civil action may be commenced against the party. *E. g., Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 719 (7 Cir. 1969); *Miller v. International Paper Co.,* 408 F.2d 283, 291 (5 Cir. 1969); *Mickel v. South Carolina State Employment Service,* 377 F.2d 239, 242 (4 Cir. 1967). This restriction on civil actions serves the dual purpose of affording notice to the charged party and providing a means for voluntary compliance and conciliation. *Bowe v. Colgate-Palmolive Co., supra,* 416 F.2d at 719.

While recognizing the importance of these goals, courts have nonetheless refused to adhere rigidly to the procedural restrictions. Under certain circumstances, courts have found that the failure to name an international union in an EEOC charge does not bar a subsequent Title VII action against the international in federal district court. *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177, 180–184 (1974) (joinder of international found to be

---

**25.** Plaintiffs argue that the decision in *Davis v. Valley Distributing Co., supra,* 522 F.2d 827, requires the Court to apply a 180-day statute of limitations to the instant case, even though the alleged act of discrimination here ceased almost 2½ years before the effective date of the 1972 amendment. The holding in *Davis* is much narrower. The court merely concluded that

"Congress intended the extended limitations period to apply to all unlawful practices that occurred 180 days before the enactment of the 1972 Act * * *." 522 F.2d at 830. There is nothing in the *Davis* decision that justifies, much less requires, applying the 180-day period to a claim that was time barred over 2 years before the effective date of the 1972 amendment.

indispensable party); *Kaplan v. International Alliance of Theatrical State Employees,* 7 FEP Cas. 894, 895 (C.D.Cal.1973) (joinder of international permitted because plaintiff had "substantially complied" with Title VII procedure requirements); *Torockio v. Chamberlain Mfg. Co.,* 3 EPD ¶ 8078 (W.D.Pa.), *dismissed on other grounds,* 3 EPD ¶ 8294 (W.D.Pa.1970) (joinder of international found to be desirable party). *Cf. Tuma v. American Can Co.,* 367 F.Supp. 1178, 1185–1186 (D.N.J.1973) (joinder of international refused).

In *Evans v. Sheraton Park Hotel, supra,* 164 U.S.App.D.C. 86, 503 F.2d 177, the Court of Appeals for the District of Columbia allowed joinder of an international union unnamed in the prior EEOC charge which it found to be an indispensable party to the civil litigation under Rule 19 of the Federal Rules of Civil Procedure.[26] Suggesting that a flexible interpretation of the statute's procedural requirements may sometimes be necessary to achieve its substantive objectives, the court reasoned:

> "To expect a complainant at the administrative stage, usually without aid of counsel, to foresee and handle intricate procedural problems which could arise in subsequent litigation, all at the risk of being cast out of court for procedural error, would place a burden on the complainant which Congress neither anticipated nor intended." 503 F.2d at 183.

 The Court is persuaded that the logic of *Evans* is apposite to the instant case. Insofar as plaintiff proves any liability on the part of the unions, the international union is an indispensable party. On the one hand, plaintiffs' claims are asserted systemwide against Western's practices at all of its stations; the tentative class includes certain women employed by Western who were members of B.R.A.C. and subject to the 1969 Agreement between Western

and B.R.A.C. On the other hand, B.R.A.C. # 3001 represents only Western's employees at its San Francisco, Oakland, San Jose and Reno facilities. Therefore, were B.R.A.C. not retained as a party to this action, complete relief would potentially not be available to the parties.

Recognizing that the joinder of the international responds both to the considerations of just and efficient litigation stressed by Rules 1 and 19 of the Federal Rules of Civil Procedure, and to the substantive purpose of ending discriminatory employment practices and compensating the victims thereof embodied in Title VII, the Court finds that B.R.A.C. is a proper party to this action.[27]

 Plaintiffs charge the unions with two violations of Title VII: (1) knowing acquiescence in Western's reliance upon state protective legislation to determine an employee's "fitness and ability" for assignment and promotion, and (2) the negotiation of a discriminatory rate structure for the contractual period from 1963 to 1969. Because the applicable period of limitation is ninety days prior to June 17, 1971,[28] the claims against the local and the international must be confined to the period beginning March 18, 1971. As a result, plaintiffs' claim with respect to the bargaining agreement in effect from 1963 to 1966 is barred.

 As discussed above, the Court does find that Western's unjustified reliance on state protective laws and its resultant restriction of women's job opportunities violated Title VII. However, neither B.R.A.C. nor B.R.A.C. # 3001 is liable for this reliance or its effects. As the district court concluded in *Rosenfeld v. Southern Pacific Company, supra,* 293 F.Supp. at 1229:

> "4. The [union] was under no legal obligation or duty to challenge the validity of the State laws and regulations re-

---

**26.** The Court located no case in which a court refused to join an international found to be an indispensable party.

**27.** It is noteworthy that defendants made no claim of lack of jurisdiction in their answer or

pretrial statement. Their delay in raising the objection suggests to the Court that B.R.A.C. suffered little, if at all, from plaintiffs' failure to name it in the EEOC proceedings.

**28.** See n.17, *supra.*

garding the employment of women herein at issue by instituting a suit to determine the validity of such laws and regulations.

"5. The failure of the [union] to take such action was not a violation of the Civil Rights Act of 1964."

See also Ridinger v. General Motors Corp., 325 F.Supp. 1089, 1099 (S.D.Ohio 1971).

Furthermore, plaintiffs have presented no evidence that the unions failed to grieve Western's reliance upon state protective legislation in determining an employee's "fitness and ability." On the contrary, the record shows that the unions actively attempted to defeat Western's reliance upon the state statutes through grievance procedures. When plaintiff Sturm's displacement bid was denied on grounds that she failed to meet the "fitness and ability" requirement under California law, the Local Chairman of B.R.A.C. # 3001 (Keith Ledbetter) grieved the denial, urging the preeminence of federal law. Again, when plaintiff Roberts was denied her displacement bid on the same grounds, Ledbetter grieved the matter. Accordingly, the Court finds that plaintiffs have failed to prove any liability on the part of the unions for Western's unjustified reliance upon state protective legislation.

Plaintiffs have likewise failed to establish their second claim against the unions. Whatever the unions' complicity in any denial of equal pay under the 1966 Agreement might have been, plaintiffs did not file any charge against either the local or the international until June 17, 1971—624 days after the 1969 Agreement went into effect. Plaintiffs' failure to file within the 90-day statutory period deprives the Court of jurisdiction and mandates the dismissal of the equal pay claim against B.R.A.C. and B.R. A.C. # 3001.

## VI. PLAINTIFF SHANNON ROBERTS

In addition to the claims asserted in the class suit, plaintiff Shannon Roberts alleges that she was wrongfully terminated by Western in retaliation for her filing of charges against Western with the EEOC.

Before setting out the facts relevant to Roberts's claims, it should be emphasized that the Court's determination of the factual issues was strongly influenced by its evaluation of her testimony. In the Court's opinion, Roberts was not a credible witness. Many witnesses testified as to her poor work record, her tardiness, and her absenteeism; Roberts submitted only her own uncorroborated testimony in opposition. Furthermore, in many instances, Roberts's testimony at trial was shown to contradict her earlier deposition testimony.

Roberts began her employment with Western as a secretary at San Francisco on January 16, 1967. In 1968, she bid into Denver where she served as secretary to the chief pilot. In December, 1968, she transferred to Oakland where she was reclassified as a secretary/agent. Although she was supposed to spend half her time doing passenger service ticketing work and the other half doing secretarial work, she in fact ordinarily spent six hours a day as a secretary and two hours as a passenger service agent. In 1969, Roberts virtually ceased her secretarial duties and became a regular passenger service agent.

While at Oakland, Roberts had the worst tardy and absentee record of any employee at the station. In 1969 she was late 43 times for a total of 21 hours, compiling a record for lateness which surpassed by 4 hours the combined tardiness of all other employees at the station. In addition, Roberts had poor work habits and was repeatedly reprimanded for poor performance or non-performance of job duties. Her manager concluded that she was the worst employee he had ever had.

On February 12, 1970, a reduction in Western's personnel at the Oakland station resulted in the abolition of Roberts's position at that station. She was unable to displace any less senior personnel at Oakland, largely because of a back injury she had sustained two months earlier. Although she had been released from her doctor's care on December 31, 1969, the doctor strongly suggested that she not lift anything exceeding the California weight re-

strictions. As a result, she was prevented from obtaining any position which required lifting over 25 pounds.

Roberts began work in San Francisco in March, 1970. While working there, she compiled one of the worst tardy and absentee records at that station. After receiving a written warning regarding tardiness and absenteeism on January 18, 1971, Roberts failed to punch in as required by company rules on January 26, 1971. Later that day she manually recorded her arrival time as 6.0 hours (her scheduled time of arrival). On February 6, 1971, Roberts advised Keith Ledbetter, in his capacity as Senior Customer Service Representative, that she had arrived on time for January 26th and had him approve her time card.

After Roberts's tardiness came to the attention of Jack Toigo, the Passenger Service Manager at San Francisco, he notified Roberts on February 9, 1971, pursuant to the collective bargaining agreement, that Western was undertaking an investigation into a charge against her of "willful violation of company policy by manual and false entries on your time card for the dates of January 26, 1971 and February 1, 1971." The investigation proved the charge to the satisfaction of the investigator. Roberts was terminated for willful violation of company policy by making manual and false entries on her time card on January 26, 1971.

Roberts must present further evidence before the Court will find that she has been denied equal pay. The record is clear that sometime in 1969 she ceased her secretarial duties. However, there is no indication as to the date on which her duties changed, nor is there any evidence showing whether from that time on she was paid at a station agent rate, a transportation agent rate, or a secretarial rate. Roberts must clarify these factual issues before the Court can decide her equal pay claim.

The overwhelming weight of the evidence indicates that Roberts has failed to prove any other claim against Western, B.R.A.C., or B.R.A.C. # 3001. Because her attempts to displace less senior employees were de-

nied in large part because of her medical disability, she was not denied equal employment opportunities. Her work records at both Oakland and San Francisco demonstrate that she was terminated by Western for good and sufficient cause, not in retaliation for her filing of charges against Western with the EEOC.

■ An adverse decision as to the merits of Roberts's claim, however, does not render the entire class action moot. Actions on behalf of a class may survive even though claims of the individually named plaintiffs do not. *Sosna v. Iowa*, 419 U.S. 393, 401, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Cleaver v. Wilcox*, 499 F.2d 940, 942 (9 Cir. 1974).

"If the plaintiff were a member of the class at the commencement of the action and his competency as a representative of the class then determined or assumed, the subsequent dismissal or mootness of his individual claim, particularly in a discrimination case, will not operate as a dismissal or render moot the action of the class, or destroy the plaintiff's right to litigate the issues on behalf of the class." *Moss v. Lane Company, Inc.*, 471 F.2d 853, 855 (4 Cir. 1973).

*See also Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8 Cir. 1970). It is therefore appropriate for this Court to pass judgment on the merits of the class claims.

## VII. REMEDY

Having determined that Western has, to a limited extent, denied equal employment opportunities to certain members of the class, the Court must next determine the appropriate course of action to remedy the injuries suffered. In her individual action, Roberts must show exactly when she became a full-time passenger service agent, at what rate she was paid from that time until her termination, and the amount which she believes she is owed. With respect to the denial of equal employment opportunities, plaintiffs have the burden of proving on an individual basis the harm suffered. Each claimant must present either documentary evidence or corroborating testimony to veri-

fy her claim. For those claims relating to the Western station in Portland, Oregon, Western should present all available evidence as to the date that it ceased compliance with Oregon Sanitation and Physical Welfare Order No. 16. At present, the record indicates only that Western ceased compliance sometime in 1969.

## VIII. ORDER

The above constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. Accordingly,

IT IS HEREBY ORDERED that a hearing will be held at 9 A.M. on Thursday, October 28, 1976, to determine the schedule for resolving the remaining issues herein, as more fully set forth in Section VII.

IT IS HEREBY FURTHER ORDERED that counsel for defendants B.R.A.C. and B.R.A.C. # 3001 will promptly prepare an appropriate form of judgment, obtain approval of counsel for plaintiffs as to form, and submit it to the Court for execution.